## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

RICHEA MAE B.,[1]                              )
                                               )
                    Plaintiff,                 )
                                               )
vs.                                            )    Civil No. 18-cv-1175-CJP[2]
                                               )
COMMISSIONER OF SOCIAL                         )
SECURITY,                                      )
                                               )
                    Defendant.                 )

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying her application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for SSI in December 2014, alleging a disability onset date of December 31, 2000. After holding an evidentiary hearing, ALJ Christal Key denied the application on July 7, 2017. (Tr. 13-27). The Appeals Council denied plaintiff's request for review, rendering the ALJ's decision the final agency decision. (Tr. 1). Plaintiff exhausted her administrative remedies and filed a timely complaint with this Court.

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 11.

## Issue Raised by Plaintiff

Plaintiff argues that the ALJ improperly determined her RFC in the following respects:

1. The ALJ's conclusion that plaintiff's symptoms were controlled if she took her medication was not supported by the medical evidence.

2. The ALJ failed to appreciate that plaintiff lacked the insight to understand the importance of compliance with treatment.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. The standard for disability under both sets of statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals

has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is

presently unemployed; (2) whether the claimant has an impairment or combination

of impairments that is serious; (3) whether the impairments meet or equal one of

the listed impairments acknowledged to be conclusively disabling; (4) whether the

claimant can perform past relevant work; and (5) whether the claimant is capable of

performing any work within the economy, given his or her age, education and work

experience.   20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th

Cir. 2009).

If the answer at steps one and two is "yes," the claimant will automatically be

found disabled if he or she suffers from a listed impairment, determined at step

three.   If the claimant does not have a listed impairment at step three and cannot

perform his or her past work (step four), the burden shifts to the Commissioner at

step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014). However, while

4

judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Key followed the five-step analytical framework described above. She determined that plaintiff had not been engaged in substantial gainful activity since the application date. The ALJ found that plaintiff had severe impairments of bipolar depressive disorder, anxiety, and borderline personality disorder, which did not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to do work at all exertional levels, limited to no climbing of ladders, ropes, or scaffolds; no work at unprotected heights or around moving mechanical parts; no operation of motor vehicles; only simple, routine tasks and simple work-related decisions; only occasional interaction with supervisors and coworkers; and no contact with the public.

The ALJ found that plaintiff could not do her past relevant work. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not disabled because she was able to do other jobs that exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1.      **Agency Forms**

Plaintiff was born in 1977 and was 37 years when she applied for benefits. She had been approved for SSI in 2011, but her benefits were discontinued after a medical review; that decision was final in May 2014.   (Tr. 186-188).   She said she was 5'4" tall and weighed 165 pounds.   She had completed the eleventh grade. She had worked as a line operator in a factory, a prep cook, a sandwich maker/cashier in a Subway sandwich shop, and a waitress.   (Tr. 191-192).

In a Function Report submitted in March 2015, plaintiff said she was unable to work because of "too many anxiety issues along with ptsd, can't be in large groups of people.   Taking my meds make[s] me not be able to work in factories or around machinery/equipment."   (Tr. 201).   She said she did not leave home alone because of anxiety issues.   She had problems getting along with other people and with authority figures.   She had been fired from a job because of her attitude.   She could not handle stress or changes in routine.   (Tr. 201-208).

2.      **Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing in February 2017.   (Tr. 38).

Plaintiff got divorced and engaged to another man in 2016.   She was homeless at the time of the hearing.   She stayed wherever she could.   (Tr. 41-42).

Plaintiff said she was fired from her last job in 2014 because she tried to suffocate someone at work and pulled a knife on someone else.   She testified that she could not work because it was really hard for her to get out of bed and she could not deal with a lot of people or groups of people.   She got paranoid and had panic

6

attacks. She could not function when she was around a lot of people. She said that, even thought she was on medications, they were not a "fix-all" and she still had times when she lost her temper. (Tr. 43-44).

Plaintiff testified that there were times when she did not care to take her medications because it was not going to change anything, but she took it anyway. She had to set alarms to remind her to take medications or have someone remind her. She went off her medications after her disability benefits were discontinued in 2012. She got back on her medications about six months later, around February 2013. (Tr. 47-48). She was hospitalized for suicidal ideation in March 2016. She was taking her medications at that time. (Tr. 54).

A vocational expert (VE) also testified. The ALJ asked him a hypothetical question which corresponded to the RFC assessment. The VE testified that this person could not do plaintiff's past work, but she could do other jobs that exist in the national economy. (Tr. 59-61).

### 3. Relevant Medical Records

Plaintiff received mental health treatment at Crider Health Center. She regularly saw Nurse Jeanne Neihaus there for medication management. Between February 2014 and January 2015, plaintiff saw Nurse Neihaus every month or two. The diagnoses were bipolar I disorder, PTSD, polysubstance dependence and alcohol abuse. She was prescribed Seroquel, Lamictal, Abilify, Remeron (for sleep) and Trifluoperazine as needed for anxiety. Nurse Neihaus generally noted that her behavior was cooperative, concentration was within normal limits, and her judgment and insight were fair. Plaintiff reported medication compliance in

7

February, April, and May 2014. At the visit in May, she reported that she had been experiencing depression, mood swings, and anxiety. She had blown up at her mother and family a couple of weeks earlier and the police were called. (Tr. 389-405).

In late June 2014, plaintiff told Nurse Neihaus that she had stopped taking her medications in mid-May because of lack of insurance. Over Memorial Day weekend, plaintiff had gotten into a physical altercation with another woman at a campground; the other woman's jaw required surgery, but no criminal charges were filed. Plaintiff had been back on her medications for two weeks and said that it had "actually been pretty good." Nurse Neihaus noted that plaintiff had not called the office for refills. She stressed to plaintiff that "we will continue her meds regardless of whether or not she has insurance." Her medications were refilled for thirty days. (Tr. 383-388).

At visits in July and August, plaintiff reported that she was compliant with her medications. (Tr. 371-382). However, in October 2014, plaintiff told Nurse Neihaus that she had been depressed and had been having suicidal thoughts for about two weeks. She said she been denied social security, she "walked out on the job one day," and her Jeep was repossessed. She reported medication compliance. Nurse Neihaus instructed her to go to the hospital for evaluation and stabilization. (Tr. 365-370).

Plaintiff was admitted to the hospital through the emergency room on October 15, 2014. She presented with depression and suicidal ideation for two weeks. She reported that her home medications "are not helping." She was

tearful with a flat affect and was described as clearly appearing depressed. (Tr. 311-312). She was treated with individual psychotherapy, group therapy, and inpatient milieu. Plaintiff was discharged on October 18, 2014. The discharge note indicates that she "showed a good response with stabilization of symptoms." (Tr. 325-331).

Plaintiff saw Nurse Neihaus about ten days after her discharge from the hospital. Her depression and suicidal ideation were resolved, and she felt much better. Her medications were adjusted in that the dosage of Lamictal was increased and she was started on Buspar. Plaintiff stated that her meds were helping her. (Tr. 359-364).

In November 2014, plaintiff reported that Buspar was helping. She was showing improvement in social aspects, determination, and decision making. (Tr. 353).

In January 2015, she was taking her medications and reported that she was doing "pretty good" with no stress and no fighting. (Tr. 347-348). Throughout most of 2015, plaintiff continued to take her medications and Nurse Neihaus indicated that her bipolar disorder and PTSD were "stable/well controlled." (Tr. 849-878). However, in December 2015, plaintiff reported that she had been under a lot of stress with the holidays and she was getting divorced. She had run out of Trifluoperazine and had worsened without it. Nurse Neihaus "advised to always call for refills." Her medications were refilled. The assessment was mild exacerbation of bipolar disorder and moderate exacerbation of PTSD. (Tr. 843-848).

In February 2016, Nurse Neihaus assessed plaintiff's condition as "stable/well controlled" and she was compliant with her medications. (Tr. 905-9110).

Plaintiff was hospitalized from March 9 through March 12, 2016. She was covered by Medicaid. (Tr. 656). She presented in the emergency room with suicidal ideation. She reported that recent deaths in the family and her son's car accident triggered thought of suicide. She was tearful but calm and cooperative. (Tr. 665). She was treated with individual psychotherapy, group therapy, and inpatient milieu. The discharge note indicates that she "showed a good response with stabilization of symptoms." In addition, "Patient was able to note stressors that led to suicidal feelings. Patient was able to define and prioritize the psychosocial interventions that the client could access to help decrease that risk should a crisis occur." (Tr. 676). Mental status examination showed that she was alert, oriented, friendly, and cooperative. Her mood was good and thought process was goal directed and logical. Judgment and insight were improved. She was started on Gabapentin and her dosage of Remeron was changed. (Tr. 675- 677).

Plaintiff saw Nurse Neihaus in early April 2016. She noted that plaintiff had missed appointments with her and with a therapist. Plaintiff reported that she had been hospitalized. She had been out of medications since April 1. Her medications were refilled. Plaintiff said that her current medications were helpful, and she wanted no changes. (Tr. 899-904).

In early May 2016, Nurse Neihaus noted that plaintiff had been to the emergency room on April 14 with anxiety and chest pain following an argument

with her boyfriend. She was "much better" since then. She set an alarm clock to remind her to take her meds. Her condition was stable and well controlled. (Tr. 892-897).

In July and August she was doing well, except that at the August visit she reported that someone had stolen her Seroquel a couple of weeks prior. Nurse Neihaus "encouraged [patient] to call in future if she is out of any meds." She had started a part-time job at a pizza parlor. (Tr. 879-891).

In October 2016, Nurse Neihaus noted that plaintiff was homeless and was living in a campground with her boyfriend and her mother. Her anxiety was high, and irritability was increasing. Her meds were not working. She was on a "housing list" and "Jeremy" was helping her with coordination of care and stress management. Her disability hearing was the next month. Her dosage of Lamictal was increased for mood stabilization and she was started on Hydroxyzine Pam (Vistaril) as needed for anxiety. (Tr. 945-949).

The record contains notes of two more visits with Nurse Neihaus. In November 2016, plaintiff had an Ace wrap on her arm; she said she slammed it in a car door the day prior. She had also punched a hole in a wall. She was talking rapidly and said she had not gone out in a week to avoid people. Her stressors included having no place to live. A month prior, she had not taken her meds for three days because her boyfriend told her not to. She was living in a state park in Robertsville, Missouri. On exam, her mood and affect were irritable. Her speech was rapid, and her thought process was circumstantial. Her thought content and cognition were within normal limits. She had auditory hallucinations. Her

memory was normal, and she was fully oriented. Insight and judgment were within normal limits. The clinical summary was that her mood had worsened, most likely due to stressors and emergence of nightmares reflecting past abuse. She had missed counseling appointments and wanted to resume counseling. She had the assistance of "IHS Jeremy" for housing, finances, stress management and other supports. She was to restart Trifluoperazine which she had used successfully in the past for breakthrough psychosis/agitation. (Tr. 940-943).

On January 30, 2017, plaintiff had been without her meds for four days as they had been lost or stolen. She was homeless and living in a car. Her best friend had been murdered by her brother. She was to resume taking her medications and to resume counseling. (Tr. 933-937).

The record contains notes from IHS Jeremy Holland for encounters between September 2016 and February 2017. (Tr. 957-1029). The notes reflect that he attempted to help her get housing. He accompanied her to several visits with Nurse Neihaus and to her social security disability hearing. He saw her six times in September 2016 to complete paperwork for her annual assessment. She was homeless and was staying with friends in Villa Ridge, Missouri. At the first five visits, her mood and affect were normal, and she was talkative and cooperative. Her appearance and clothing were clean. She denied suicidal ideation. On September 28, 2016, plaintiff told Mr. Holland that "she quit her job based on her lawyer's advice. Her new plan is for her aunt and boyfriend to find jobs while she waits for SSI appeal." She said that getting a place to live was her primary concern. (Tr. 977-978). The next day, she was crying and depressed because

she was homeless and waiting for a disability hearing.  (Tr. 982).

Mr. Holland accompanied plaintiff to her appointment with Nurse Neihaus on October 4, 2016.  Her Lamictal was increased.  (Tr. 984).  On October 11, she told Mr. Holland that her medications were working okay, and she felt normal. (Tr. 993).  Mr. Holland visited her on December 29, 2016, after she missed an appointment with Nurse Neihaus.  Plaintiff acknowledged that Nurse Neihaus had told her that she would refill her medications and that she needed to call for the refills.  (Tr. 1016-1017).  Mr. Holland met with plaintiff on January 31, 2017, after Nurse Neihaus requested that he perform a safety check.  Plaintiff reported having suicidal and homicidal ideation, but said she was able to cope.  She had obtained medications the day before, after having been out.  She said it was "too soon for them to start helping again."  (Tr. 1020).  Mr. Holland spoke to plaintiff by phone the next day.  She said "she was feeling much better since her medications 'kicked in.'"  She was no longer having suicidal or homicidal ideation and felt more at ease.  (Tr. 1023).

### 4.    Nurse Neihaus' Opinion

In October 2016, Nurse Neihaus completed a form assessing plaintiff's mental RFC.  (Tr. 912-917).  She wrote that plaintiff "has experienced past exacerbations of irritability, depression, [and] anger when off meds.  Now stable." She also wrote, "Stable at this time regarding bipolar disorder.  However, she was experiencing increased anxiety @ 10/4 evaluation due to homelessness."  She said that plaintiff reported no side effects from her medications.  She noted that plaintiff's ability to understand, remember and carry out instructions was not

affected by her impairment. Question number 9 asked Nurse Neihaus to rate plaintiff's limitations with regard to a number of work-related mental functions. Nurse Neihaus wrote, "Not assessed in terms of work. However, [patient] has not voiced any such impairments." Question number 10 asked whether plaintiff's ability to respond appropriately to supervision, coworkers, and work pressure was affected by her impairment. Nurse Neihaus checked "no," but wrote, "Could be yes if she is off her medications due to increased mood swings, irritability, anger when off meds." Nurse Neihaus indicated that plaintiff had no restriction of activities of daily living, a slight restriction in maintaining social function, and only seldom had deficiencies of concentration, persistence, or pace. She wrote that plaintiff would have one or two episodes of decompensation a year "if off medications."

## Analysis

Plaintiff first argues that the ALJ should have included additional limitations in the RFC assessment, namely, that plaintiff cannot make simple, work-related decisions, cannot consistently interact with supervisors and coworkers, would be off-task during an eight- hour workday, and would be tardy or absent from work more than two days per month on a consistent basis secondary to symptoms from bipolar affective disorder I, depression, post-traumatic stress disorder/anxiety, and personality disorder. She points to no medical evidence to support those limitations, and her position is contradicted by Nurse Neihaus' opinion.

Plaintiff argues that the ALJ erred in concluding that her condition is stable and well-controlled as long as she takes her medications as prescribed. In support, she points to her hospitalizations in October 2014 and March 2016,

arguing that she was taking her medications at the time of both hospitalizations. However, the ALJ did not ignore these hospitalizations. Rather, she acknowledged them, noting that plaintiff was discharged after only a few days in stable and improved condition. (Tr. 23). Plaintiff accuses the ALJ of "discounting" these hospitalizations by that last observation (Doc. 19, p. 5), but the ALJ's remark was an accurate summation of the discharge summaries. Further, the ALJ pointed out that a urine drug screen done at the first hospitalization was positive for cannabinoids and amphetamine, a fact not mentioned by plaintiff.

Plaintiff does not point to any medical evidence that was overlooked or misconstrued by the ALJ. She argues that "the ALJ should have considered that Plaintiff's allegations of disabling mental impairments, despite treatment compliance, are more credible because Plaintiff was hospitalized two (2) times." (Doc. 19, p. 5). However, two brief hospitalizations over the period in issue do not establish that plaintiff was disabled. The ALJ could reasonably conclude on this record that, overall, plaintiff's symptoms were controlled and her condition was stable when she took her medications as prescribed. Nurse Neihaus' opinion provides substantial support for that conclusion. The ALJ noted that her opinion was consistent with the record as a whole. (Tr. 24). It is telling that plaintiff does not mention Nurse Neihaus' opinion at all in her brief.

Plaintiff does point to a statement which appears repeatedly in Nurse Neihaus' notes: "SEVERITY: severe [disorder], w/o meds exacerbations of anger, aggression. DURATION: chronic stable, w/well-defined periodic acute exacerbations." This note appears at Tr. 849, 855, 861, 879, 886, 892, 899, 905,

15

911.   Plaintiff "interprets this as confirmation that even with medication compliance, Plaintiff continues to experience well-defined, periodic acute exacerbations of symptoms, which would interfere with Plaintiff's ability to sustain competitive employment."   However, plaintiff's interpretation is not compelling. Rather, the acronym "w/o" means "without."   See, https://medical-dictionary. thefreedictionary.com/w%2fo, visited on March 21, 2019.   Therefore, the more logical interpretation of Nurse Neihaus' note is that plaintiff experiences exacerbations of anger and aggression when she fails to take her medications. This interpretation is consistent with Nurse Neihaus' opinion.   Contrary to plaintiff's argument, this note supports the ALJ's conclusion.

Plaintiff also argues that the ALJ failed to determine whether plaintiff's failure to comply with treatment was justifiable.   The ALJ acknowledged that plaintiff was without insurance for some time, but she also pointed out that Nurse Neihaus noted that plaintiff had not called the office for refills.   (Tr. 22).   Plaintiff ignores the fact that Nurse Neihaus repeatedly assured plaintiff that her office would provide medications even if plaintiff had no insurance.

The rest of plaintiff's argument is contradicted by the record.

Plaintiff faults the ALJ for saying that plaintiff went camping over the Memorial Day weekend, arguing that she was not camping for pleasure but was living in a campground because she was homeless.   This argument is contradicted by the record.   Nurse Neihaus' notes place this as Memorial Day of 2014.   See, Tr. 383-388.   While plaintiff did become homeless later, she was at that time still married and living in a house with her husband.   See, plaintiff's testimony, Tr.

41-42.

Plaintiff argues that her lack of insight, judgment and coping skills rendered her unable to understand the need to be compliant with prescribed medications. (Doc. 19, p. 7). However, no medical care provider made that assessment. Plaintiff points to a note by Dr. Ferrer stating that she has little if any coping skills. In fact, the doctor's notes said she has "limited coping skills," not "little if any coping skills." Dr. Ferrer was the doctor who saw plaintiff during her hospital stays in October 2014 and March 2016, when her symptoms were exacerbated. In the discharge summaries, he wrote "Patient was able to note stressors that led to suicidal feelings. Patient was able to define and prioritize the psychosocial interventions that the client could access to help decrease that risk should a crisis occur." (Tr. 676). This note suggests that plaintiff had coping skills. Lastly, Dr. Ferrer did not indicate that plaintiff lacked the ability to understand the need to take her medications. No other healthcare provider expressed that opinion. In fact, as the ALJ pointed out, Nurse Neihaus' exams repeatedly showed that plaintiff's judgment and insight were fair. See, Tr. 22.

Plaintiff also argues that, "Perhaps the most persuasive evidence that Plaintiff lacks the insight, judgment and coping skills to remain treatment compliant and to deal with everyday stressors is the fact that she qualifies for in-home services (IHS) through the Department of Mental Health (DMH) and Crider Health Center. Jeremy Holland, MA, is Plaintiff's in-home case manager." (Doc. 19, p. 8). However, nothing in the record establishes the criteria for such in-home services. There is no suggestion in any of the treatment notes, including Jeremy Holland's notes, that

plaintiff lacks the insight, judgment, and coping skills needed to take her medications as prescribed.

In short, the medical records and Nurse Neihaus' opinion provide substantial support for the ALJ's conclusion that plaintiff's symptoms are stable when she takes her medications as prescribed. The isolated parts of the record cited by plaintiff do not undermine that support.

This is not a case in which the ALJ failed to discuss evidence favorable to the plaintiff or misconstrued the medical evidence. Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence. She has not identified a sufficient reason to overturn the ALJ's conclusion.

Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d at 413.

**Conclusion**

After careful review of the record as a whole, the Court is convinced that ALJ Key committed no errors of law, and that her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits is AFFIRMED.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:   March 22, 2019.**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**U.S. MAGISTRATE JUDGE**